Please sit down. This is a matter of Mahogany Bolden v. The Workers' Compensation Commission, 5080442. Counsel, please. May it please the Court. I'm Michael McGlynn, and I represent the district of Mahogany Bolden. Mahogany Bolden was a CNA and working at a group home for profoundly mentally impaired individuals. The individuals were so impaired that they needed to have 24-hour supervision, and she was one of the assistants there as a CNA. She was battered by a patient there, and I think it's important to note that before the trial started, I've noted in the brief, the respondent agreed that during the course of her employment, Mahogany was battered by a mental patient, Chuck Gibson, and sustained injuries. The respondent agreed to that. In addition, and this is perhaps more important, the respondent did not dispute that Mahogany Bolden did have an accident that arose out of and in the course of her employment. So the issue really turns on, does it not, as to whether or not there's evidence to support a finding that Mahogany Bolden was an aggressor? Isn't that part of the analysis here? I don't think that the aggressor defense applies to this case. I think actually that the more, I'll get back to the aggressor defense, but I do think that the more appropriate standard is the one articulated by the Supreme Court in the Rodriguez case, in which the court specifically dealt with cases that involved assault by a drunken or insane co-employee. They fall into a special category. And the reasoning, citing to Professor Larson, the reasoning behind that and why they are different cases is because when a co-employee suffers from a delusion or some similar condition, which causes him to erupt into violence. Is that a co-employee? Yes. This is not the situation of a co-employee, is it? No, it is not, but actually I think our case is actually stronger. And as the reasoning goes on, it applies actually I think with more power to a situation where you're actually dealing with a patient. It says in similar condition, the co-employee, he has a condition which causes him to erupt into violence. His presence in the workplace, in his state, is a condition under which the victim is employed and must perform her work. Just as a defective machine or ceiling in the workplace would be, and in that sense is a risk peculiar to the employment not shared by the world at large. And so to be more specific in response to your question, I think that the patient, just like a co-employee, was the defective machine. The patient had violent propensities. He was a 6'9 psychopath who, with the diagnosis the record reflects, had mental retardation, bipolar disorder with psychotic features. And he experiences irritability, psychomotor agitation, depressive mood swings, anxiety episodes, and paranoid ideation. I don't think there's any question he was suffering from serious mental health issues. Let me ask you this. Are you aware of any cases that have extended the holding that you just recited to this situation of a patient in a healthcare facility? No, except I suppose that by analogy, if a nurse is lifting a patient and hurts her back, she's helping. It's not a co-employee that causes her the injury. It's the patient that she's attempting to serve. And so those cases are all analogous. And I think that our case is stronger than the Rodriguez case. In the Rodriguez case, the person, the co-worker, was a bigot. And he struck the petitioner on the back of the legs with a two-by-four. The petitioner threw the board back at him. And then he stuck up behind, hit him in the head. And I think in this situation, our case is more compelling because if you consider the record and the atmosphere in which these folks were supposed to work, it was a tinderbox. As Mr. Rostanz, the supervisor, testified, he said that Mr. Gibson, for example, and the other people there would threaten other clients. Well, here's what I'm curious about. Let's assume for the sake of the argument, as it were, that everything you say is true. Does this become some kind of a strict liability? Isn't it true that the acts of a claimant, if they're aggressive, can take that person out of the scope of their employment? So is it automatic that there is some violent altercation in a facility such as this between the worker and the assailant, if you will, with this automatic recovery? What about if the worker, the claimant, taunts the mentally ill person? Isn't there something? Isn't that entering the analysis at all, in your opinion? Well, I think that that certainly could enter into the analysis. That's not the situation here. I think that the Supreme Court is pretty clear, I think, and strong in saying, in, for example, the Rodriguez case, that when you're dealing with someone who is irrational, for example, in the Rodriguez case, it's hard to know how you're going to act in a way that is not going to provoke, for example, in Rodriguez, where the guy did throw the board back. But the situation is that it's a special case, and if you demonstrate that there was an assault, as here, and keep in mind that they stipulated that, that the respondent did not dispute that she had an accident that arose out of the course of the assault. All right. And I think we would all proceed on that basis, although subject to whatever opposing counsel says. My question then becomes, is can you have acts of aggression verbal in nature? Does it have to be physical? Well, I think part of the analysis there has to do with the aggressor cases. And there again, the court requires that there is a finding as to who is the aggressor. And there was no finding that Mahogany was the aggressor or, for that matter, anything on the whole point of the aggressor. Recall that the commission overturned the arbitrator's decision in terms of the hearsay, and they did not make a finding that she was aggressive in any way. On the contrary, they were silent about that. There is nothing in their finding to say that she, in some way, was aggressive as to this man. Only that they only said that she was inconsistent on some details, which I submit, and I get in the brief, that they weren't significant. Are you saying there is no evidence in the record that supports the fact or the argument that she was taunting this person? I would say there is no competent evidence in the record that she was taunting this person. Was there a co-worker that testified that she observed this whole thing and she heard the exchange between the individual and the worker? No, and that was precisely the reason why the commission overturned the arbitrator. The evidence was junk. The only co-worker who testified was Mika, who testified to an episode very, very similar to what happened, but it happened two days earlier, where what happened was that Chuck was in a car, and he became agitated because he could not have a cigarette in the car, partly because of medical, partly for safety, partly for other reasons, but once he was told he couldn't have a cigarette, he tried to kick the windows out of the car. And this was on a sort of a field trip with Mahogany and with Mika in the car. And Mika said that he became so irrational that they tried to call a supervisor, but they couldn't get a hold of the supervisor. So then they drove to a police station, and a policeman came out and said, now why are you being this way with all these people? You're scaring them. You need to calm down. The same sort of episode happened at the time of this occurrence, but there was no person who came forward to testify that she provoked him in any way. And there is no finding that she's an aggressor. Now if, on the contrary, Mahogany, what actually happened was a similar situation with regard to a cigarette. She was cooking. Chuck said he wanted a cigarette. She said, this is not your time to have a cigarette, Chuck. And he stomped off, and then he got into an argument with another patient, and there was some yelling in another room. And then he came up behind her, and she was going to call a supervisor, which from the earlier episode might be significant because the supervisor had said to them, if you ever have a problem like that, call me. I insist you call me. Well, she picked up the telephone, and then he started to beat her with the telephone and to shove her against the wall. Your position is, obviously, you're alleging that the claimant was not aggressive in any manner, first of all, toward the patient. Is that correct? Yes, and I'm more than that. What I'm claiming is that there is no competent evidence to suggest that she was an aggressor. And there's all kinds of innuendo or whatever that spoils the record, but there is no evidence that she was an aggressor. In fact, the commission, in the commission decision, all they said was that they found her to be inconsistent on a few points. Basically, they didn't trust her credibility. And that is, as you would probably have to conceive, generally a matter for the commission. Yes, yes, but not in this instance for several reasons. First of all, what they based it on was this Exhibit 3. And Exhibit 3 was itself hearsay, and if you go back and look in the brief, I point out that the stuff that they were sort of challenging her on with credibility wasn't competent evidence to begin with. And if I can try to briefly summarize that, Ms. Delahunt said that when they take statements at work, in the normal course of business, they will take a statement and they will have the person sign it as a statement. This, she said, was not a statement. She said she did not, when she talked with Chuck, who was the batterer, when she commented on what he said, she put it in quotation marks. She said she did not quote my client. She did not quote her. She said this wasn't a statement. This wasn't what they would ordinarily do in the course of their business. This was just her own reflections on what her conversation was with Mahajan. And even in that, Your Honor, even in that, with this Delahunt statement, Ms. Delahunt, the supervisor, said she had no indication that there was any, what kind of an argument there was between Mahajan, or if there was one, between Mahajan and the patient. I don't think we need to go into all the facts. Obviously, this is a manifest way to the evidence standard. As I discern your argument is that even under that test, an opposite conclusion is clearly drawn because the commission's decision was arbitrary and it's not supported by the competent evidence. Is that sort of what you're saying? Yes. In fact, it's probably better than I would have said it. On the other hand, I would say this in addition to that, Your Honor, that when you're looking at a manifest way to the evidence, it still has to be competent evidence. They didn't base it on competent evidence. That's my point of this sheet. This is not an admission by her of anything or any kind of a statement that I provoked him in some way. The commission, in order to talk about credibility, they still have to assault the credibility based upon competent evidence, and they didn't do that. Now, furthermore, with regard to manifest way to the evidence, keep in mind that all they did in the commission's decision was to say that, well, she said he shoved her against the wall three to four times, and in her testimony she said it was five to eight times. She's worried about whether he's going to throw her out a window at the time. The first part of that is whether she said three to five times to Ms. Delahunt, we don't know. These are just her reflections on what she thought was being said, and she was not quoting the client. But perhaps more importantly than that, as far as manifest way to the evidence, there is no competent evidence by which to assail her, but what they did was they said, okay, we didn't think she was reliable on those points, and so all they did was give a conclusion, and that was what then the conclusion that they gave was simply, she failed to prove she sustained accidental injuries which arose out of her employment. All right, now, that's all they said. But keep in mind, if we go back to what even the respondent stipulated to, before we even started trial, it was respondent did not dispute that Mahogany Bolden did have an accident that arose out of and in the course of her employment. And so, now. Well, there's a stipulation that an accident occurs out over the course of employment, and it's an assault case. The stipulation carries with it an admission that she's not the aggressor, because if she's the aggressor, it didn't arise out of and in the scope of her employment. So if they've stipulated to that, what are we arguing about? Yeah, I agree. That's why I brought it up, and that's why I said this is a different case than a normal manifest way to the evidence. The fact is that they stipulated that. If they stipulated that it just occurred in the scope of the employment, would there be a difference? Would there be a different implication in that stipulation? Probably, sure. Okay. What does the stipulation read? Read it to me. Your Honor, I'm quoting from the record, and I don't have it in front of me. Now I'm quoting from my brief. It says, the respondent agreed that during the course of her employment, mahogany was battered by a mental patient, Chuck Gibson, and sustained injuries. That's record page 29. That's in the course of. Yes. On record 42, the respondent did not dispute that mahogany boldened did have an accident that arose out of and in the course of the employment. Now, I believe that. Your time is up. You don't have time on rebuttal. Counsel, please. Okay. Could you follow up with that? I was just trying to find it in my record here. Allow me a couple more seconds. I will see what I can find for the court. I can get to. Mr. Midland, what pages were you quoting? It's page 42, and I think it's a discussion between you and the arbitrator. It's in the middle of all these exhibits. Page 42. Yes, unfortunately, it's in the middle of all these exhibits. Let's make it to 43. Page 42 just says, a copy of the application for adjustment of claim has been marked. And actually, the disputed issues at arbitration included accident and causation, as well as medical expenses, TTD, and the nature and extent of the injury. And those were admitted into evidence as arbitrators exhibit one, which is the signed request for hearing form. I think it may be page 29. I'm sorry. Excuse me. Okay. From what I read on page 29, there's no discussion regarding accident and causation in the record. It's a discussion between Mr. Midland and the arbitrator concerning a variety of contemporaneous issues that were discussed, as I'm sure you all have seen, throughout the record of the trial. Well, the argument seems to be that there is a stipulation that there's no dispute that this occurred in the course of and that it arose out of, right? Is that what the opposing counsel is suggesting? That was my understanding of what he was arguing to the court before he sat down, yes, Your Honor. And my response to that would be, if we had stipulated to that, we wouldn't have alleged on the request for hearing form that accident and causation were disputed issues. If I could sidetrack, I apologize. I didn't get a chance to introduce myself to the court. My name is Karen Yates-Mosh, and I am here on behalf of Support Systems and Services. We've already kind of gone over what the standard is here as the manifest way to the evidence. Could I just jump ahead just to the case? Sure, sure. Obviously, he's arguing that the evidence, the competent evidence in the record does not support the commission's finding, in essence reduced to the simplest terms. What evidence can you point to in the record specifically that does support the commission's finding? That's exactly where I was going to go, Your Honor. Thank you. He's trying to focus on, you know, one piece of paper that were Mrs. Delahunty's notes from her conversations with the petitioner and trying to say that they're not a statement and they weren't petitioner's own words. He's leaving out all of the live testimony that was presented at arbitration. This was a five-and-a-half-hour trial. This wasn't, you know, a 15-minute case that was put on. There were hours and hours of live testimony from several different witnesses. What did these witnesses say? Who are they and what did they say? There was a petitioner, of course, and she was obviously testifying on her own behalf. I think most importantly, really aside from the respondents' witnesses, which were Mrs. Delahunty and Mr. Yodder, who was Office of the Inspector General Investigator who conducted an independent outside investigation, and then Mr. Rostens, who Mr. McGlynn has already referred to as a supervisor at the group home at the time. I think the most telling live evidence is from the petitioner's own rebuttal witness, Mika Watson, who basically refuted everything the petitioner said by saying, yes, we were told how to properly behave and not behave around these individuals, and yes, there were times that I witnessed or observed or overheard Ms. Bolden saying and doing things that were inappropriate towards these individuals. What about relative to Mr. Gibson, though? If I recall correctly, Ms. Watson did indicate in her testimony that she had overheard Mr. Gibson at times calling Ms. Bolden a bitch, and then Ms. Bolden would respond, well, how would you feel if I called you that? Ms. Watson confirmed that that would not be an appropriate response or an appropriate way to respond to this individual. Is that an act of aggression? I think you have to look at it in the scope of who we're dealing with. Would you or I necessarily take that to be aggression? Maybe not. But you're talking about an individual who has the mental capacity of a seven-year-old. He's not psychotic. What did she say to him that you contend was an act of aggression that instigated the beating? What actually did she say? And who says that she said it? Well, I guess that's the rub. There is no eyewitness other than the petitioner herself and Mr. Gibson. And what did the petitioner say that she did? Did she admit that she antagonized this man? No. What did Mr. Gibson say, who has the mind of what, a seven-year-old? Correct. What did he have to say? She threatened to call the police? She threatened to call the police. Said she'd send me back to the Oregon Medical Health Center? Correct. Is that aggression? For him, yes. Wait a minute. We're not going to decide this on what a reasonable seven-year-old would want. Is that an act of aggression? I mean, we're talking about a person who is a caretaker for the mentally ill, and she's got a guy that's, what, seven feet tall? Almost seven feet tall. And she's telling him, if you don't behave yourself, I'm going to call the police. Or we're sending you back to the Oregon Medical Health Center. Why is that aggression? He doesn't like it. He goes berserk and beats her. But how can you say that that's an act of aggression that takes her out of compensability? I think the argument there, Judge, is are we going to look at aggression solely in terms of a physical gesture or physical aggression? No, it can be oral. Absolutely. I would agree. Is a threat aggressive? Yes. Okay. So that's your response. Yes, I believe so. There's no evidence that on the day of this incident that even that occurred. There was evidence from notes that were excluded as hearsay, which were Mr. Gibson's testimony. Okay. Based on what the commission considered, there is nothing to indicate that even that statement was made on the date that he struck her. Well, the only testimony of the other eyewitness would be the petitioner, who, of course, is going to say she did nothing wrong. Yes, but to support the commission's finding that there was an aggressive action by this claimant, taking this claimant out of her employment relationship, what is the incompetent evidence? Well, as Mr. McGlynn pointed out, the commission didn't find that she was necessarily solely the aggressor. They found that she wasn't credible in any of her testimony. I mean, you can certainly answer then that they were. So they find that what you say we're not going to credit at all. Okay? Right? So what are we left with as competent evidence? Let me help you. Is Venetta Jones a help to you? She certainly would have been if she had bothered to show up for her deposition, Your Honor. How does the arbitrator point to so many of her statements? They were pointed to in the commission. If you read their decision, they excluded those statements as an admissible hearsay. So what are we left with as competent evidence that there was aggressive acts taken by the claimant? On the day of, I guess we have none. But then I think we have to look at past and prior behavior. You don't think she was beaten on that day. No. The credibility is whether she got her head banged against the wall six times or eight times or ten times. Not that it didn't get banged against the wall. I think that's part of it, certainly. So that goes to the extent of her injury as opposed to the credibility of whether it happened or not. Yes. On that aspect, I would agree with you. But then I think you have to look further into what the commission was saying in that not only are there these little disputes with what she told Mrs. Delahunty initially following the incident and what she then testified to in arbitration, and I think they just picked out, at least what I got from reading their decision, they just picked out a couple of examples. But, again, it goes back to the live testimony from her own rebuttal witness that refutes her testimony, saying that no one ever – And that was what again? I'm sorry?  Ms. Watson, when she testified, saying that, yes, we were trained on how to deal with these individuals, how to respond to them. She even admitted that the incident that occurred a couple of days prior to this when they drove them to the police station was inappropriate, and that's not how they were taught to handle this. She testified that she observed Ms. Bolden taunting and saying things that were inappropriate to Mr. Gibson prior to this date. Again, she was not present on the day that this happened. Let's assume all of that is true. The question that I would have would be, you seem to be arguing like a course of conduct, you know, because you're left with the competence out of the record. I think there is a legitimate question, what is there left that supports the commission's decision? But don't we get into the issue of some sort of remoteness? Let's assume everything you say is true and there was some taunting behavior, aggressive, however you want to construe it, several days before. Is that enough to carry the date if on this occasion she was not aggressive prior to the beating? Or can you say whatever happened three days earlier is competent to hang your head in? That's my concern. I think we're talking about that day, are we not? We are talking about that day. And so what happened that day, again, not to belabor it, that was considered to be aggressive? What did she do and who witnessed it? Can you answer those questions? Well, again, the only witnesses were the petitioner and Mr. Gibson. Those were the only eyewitnesses. Is your argument this? Let me help understand it. Your argument is the commission finds that she's not credible because of inconsistencies about the nature of her injuries. Therefore, they infer that she's not credible about anything else she says, I didn't taunt, I didn't do anything. But there is competent evidence that, as Justice Hudson said, that could be credited by a coworker that she had engaged in inappropriate, arguably threatening or aggressive behavior a day or two earlier. And they would then infer that she was engaged in a course of conduct of animosity and aggression towards this person and then make an inference that that was what led to the beating and it was outside the scope and the rising out of the employment relationship. Is that your argument? Is that the commission's argument, reasoning? And I think that's a good question. I mean, is it better, is that the commission's argument? They don't necessarily use the word aggressor. They don't use the words that, you know, she threatened him on this date. What they say is that we find that her testimony as to the altercation and the events leading to it lacks credibility. Now, this is after the commission went through and struck a lot of the evidence. So this evidence that he wants to say the commission was using in relying on their decision, they didn't. So there's obviously more evidence than what he's trying to claim that the commission found was substantiated in their findings. What is it? Beth, do all threats make a person an aggressor? Goodness, you guys have some cerebral questions today. You were in the back earlier, wasn't you? I was, I was, and I was, yeah. I mean, what are the threats that she's alleged to have made? Calling the police? Calling the police, sending him back to Alton Mental Health Center. Now, assume for a moment that she made those statements. If he was performing behavior that could justify the calling of the police or might justify the sending him back to Alton, do those threats remove, indicate that she's an aggressor for purposes of denying compensation? If they're valid threats, why would we deny compensation based on the statements? Well, I guess that's the question, Judge. Were they valid threats? Well, we don't know that she made them to begin with, but assume for a moment that she did. Assuming she did, were they valid? Was this person's behavior so egregious before they were made? We don't know that either. I mean, or was he simply acting as he did on a daily basis? I think what he's getting at is a good question that concerns me as well. Somehow the caretaker, the claimant, is charged with the responsibility of maintaining some type of control over the patients, would you agree with that? Certainly. And that's part of her job. So if one of the ways to do that is to threaten, use the word threaten, to move Mr. Gibson to another facility, as in there's some evidence in the record that I think he responded to that, there's evidence that he responded to that kind of statement, why is that inappropriate and takes it completely outside the scope of employment? Can't she say anything to him to get him to calm down? Well, if you look at her testimony, the petitioner's testimony, she said, I was the only one who can calm him down. I was his favorite. So why was she his favorite and why did she spend all this time with him? I mean, she went on and on for pages and pages of testimony about how she felt like she was Mr. Gibson's favorite caretaker. They got along very well. She had never had any problems with him in the past. But yet then there's all this other testimony about things that she had said and done to him throughout the course of her caretaking. Do you have any testimony that the employees were told not to, in a protocol, to say those statements? Yes, from Mr. Rostens. Thank you. Thank you. First of all, Mr. Rostens actually testified that he didn't recall whether he told Gibson he would send him back to Alton. But if he did, it was not to intimidate or to provoke Gibson. That's at page 159 through 161. That's the supervisor. He said, yeah, I may have said that to him myself. Now, what she was talking about was Mika Watson as maybe the witness that would prove that there was some malevolence on the part of the witness. But if you look at her testimony, it's just the contrary. For example, Mika was the one that talked about the episode in the van, and Mika testified that Gibson told Mika he didn't know why he snapped. I wish I wouldn't have hit her. And she said mahogany did not provoke Gibson. Once a week, Gibson was doing something. I don't believe she would do anything to provoke him. And she said everyone told him to get it together or he'd be sent back to Alton. No supervisor told staff not to say that. Supervisors said that to him. Scott told him that. Telling him he would have to go back was not a threat. It was to get him to calm down. And Mika was the one that said that mahogany was the favorite. Mika also said that the supervisors tried to intimidate her to give a story contrary to the interests of mahogany. Well, let me see if I can understand your two-point position. First of all, you're saying that she had threatened to send him to Alton in the past, and that was known and that had worked to calm him down. And secondly, no one ever told her there was no protocol against her doing that. Right. That seemed to be an accepted method that she had employed in the past. Well, you're correct that Rostens himself had done it, and Mika was saying that's sometimes the only way we could calm him down. Now, keep this in mind. The record also reflects that he was sent back to Alton because he beat somebody else up. He assaulted somebody else after this, and the record reflects that. I'm trying to understand something here, and maybe it's lost on me. Are we suggesting that a person who is a caretaker of mentally ill cannot tell them that if they don't behave, they're going to another facility, or I'm going to call the police because you're seven feet tall, is an aggravation that would take that individual outside the protection of the Workers' Compensation Act in the event that the mentally ill patient beats them? That is precisely their argument, and it's based upon incompetent evidence. They're trying to make this insinuation that she in some way was threatening him and trying to broke him by sending him back to Alton. He may have viewed that as a threat, but from an objective standpoint, could any reasonable person interpret that as a threat? No, and I should say that I think on the numbers with the pages, I think I'm correct. I think that there are some, she might have been looking at the transcript page number instead of the record number with the R. I think that I was correct on that, but I wholly apologize if I had the wrong number, but it was in the colloquy between the arbitrator and counsel before we started. Okay, let's talk about the issues. And she said, now you're not contesting that, are you? She said, no, all you're doing is you're saying that there was a defense, and the defense was that he was the aggressor, and I cited that as well. But the two statements are mutually exclusive. You can't say, I agree that the injury arose out of and in the scope of the employment, and the next breath say there's a defense to that because she was the aggressor. If she's the aggressor, it didn't rise out of the employment, maybe in the course of it, but it didn't rise out of it, so it doesn't make any sense. Right, and keep in mind, I think it was a Supreme Court decision that required that the aggressor, there had to be a finding that she was the aggressor in order for there to be this deference There can only be one aggressor. Thank you.